**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**

| | |
|---|---|
| K.M.,<br><br>Plaintiff,<br><br>v.<br><br>JAI AMBAI, INC. D/B/A SUMMER BREEZE MOTEL; SHIVAM AND SAAJAN CORP D/B/A COOK'S MOTEL; RESORT HOSPITALITY ENTERPRISES, LTD. D/B/A BOARDWALK BEACH HOTEL; ROYAL AMERICAN DEVELOPMENT, INC.; KAREN GRANT RESORT PROPERTIES, LLC D/B/A EXECUTIVE INN; and SATNAM HOTEL, LLC D/B/A DAYS INN PANAMA CITY/CALLAWAY,<br><br>Defendants. | Case No. 5:26-cv-180-AW-MJF<br><br>JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

Plaintiff K.M. files this Amended Complaint pursuant to the Court's Order Requiring Repleading (ECF No. 39) against Defendants Jai Ambai, Inc. d/b/a Summer Breeze Motel ("Jai Ambai"), Shivam and Saajan Corp d/b/a Cook's Motel ("Shivam and Saajan"), Resort Hospitality Enterprises, Ltd. d/b/a Boardwalk Beach

Hotel ("Resort Hospitality"), Royal American Development, Inc. ("Royal American"), Karen Grant Resort Properties, LLC d/b/a Executive Inn ("Karen Grant"), and Satnam Hotel, LLC d/b/a Days Inn Panama City/Callaway ("Satnam") (collectively, "Defendants").

In late 2015 until November of 2016, Plaintiff's traffickers moved her through a circuit of Bay County hotels and sold her for sex out of rooms that Defendants rented, often for one night at a time. They beat her where hotel staff could see and hear it. In April of 2016, one of the traffickers chased her out of a room at the Days Inn in Callaway and slammed her head against the lobby floor in front of the front desk clerk. The rooms kept being rented, night after night, while a steady line of men came to Plaintiff's door.

## INTRODUCTION

1. Plaintiff K.M. is a survivor of sex trafficking under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (the "TVPRA"), 18 U.S.C. §§ 1591 and 1595.

2. From approximately the end of 2015 through November 2016, Plaintiff was sold for sex at five hotels in Bay County, Florida: the Summer Breeze Motel, Cook's Motel, the Boardwalk Beach Hotel, the Executive Inn, and the Days Inn Panama City/Callaway (together, the "subject hotels"). Each Defendant owned, operated, managed, or controlled one of the subject hotels.

3. Plaintiff was caused to engage in commercial sex acts at the subject hotels through force, threats of force, fraud, and coercion, including beatings, threats of serious bodily harm and death, forced drug use, the confiscation of her identity documents, daily money quotas, and the seizure of every dollar she earned. Defendants benefitted in violation of the TVPRA.

4. Plaintiff brings this action under 18 U.S.C. § 1595 against each Defendant, each of which participated in ventures and knowingly benefitted from those ventures. The ventures violated 18 U.S.C. § 1591 because they harbored, maintained, patronized, and/or solicited Plaintiff knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, and coercion would be used to cause Plaintiff to engage in commercial sex acts. Each Defendant knew or should have known that the ventures violated 18 U.S.C. § 1591 as to Plaintiff. Plaintiff also brings claims under Florida law.

## I. THE PARTIES AND PERSONAL JURISDICTION

### A. Plaintiff

5. Plaintiff K.M. is an individual over the age of majority who currently resides in Onslow County, North Carolina. Plaintiff was born in April of 1992.

6. Due to the sensitive, private, and potentially retaliatory nature of the allegations in this Amended Complaint, Plaintiff's name and address are not included in it, in order to protect the safety, privacy, and identity of a victim of sex

trafficking. Similarly situated plaintiffs throughout the country have been permitted to proceed by pseudonym or by their initials.

7. At least two of Plaintiff's traffickers are free, and at least one of them is looking for her. In November 2026, one of the men who trafficked Plaintiff at the subject hotels, identified below as "K.W.," found Plaintiff on social media, even though her account is not in her legal name. He told her he wanted her to "come back home" and that if she did not go back to him, he would find her and force her to. Another of her traffickers, J.L., was listed by the Ohio Department of Rehabilitation and Correction in 2026 as a violator at large who "should be considered dangerous and possibly armed." Public disclosure of Plaintiff's identity would expose her to a risk of retaliation and to further harm from the public association of her name with the sexual exploitation described in this Amended Complaint.

8. Plaintiff intends to file a motion for leave to proceed under the pseudonym "K.M." in all public filings and proceedings prior to trial. Plaintiff has requested each Defendant's position on this motion and is currently awaiting a response from some of the Defendants. Plaintiff's identity will be disclosed to Defendants subject to an appropriate protective order.

9. Plaintiff is a victim of trafficking as defined by 18 U.S.C. §§ 1591 and 1595. Plaintiff was trafficked at the subject hotels from approximately late 2015 through November of 2016.

**B. Defendants**

10. Defendant Jai Ambai, Inc. ("Jai Ambai") is a Florida profit corporation with its principal place of business at 9227 Front Beach Road, Panama City Beach, Florida 32407. Jai Ambai may be served through its registered agent, Rajendra Patel, at 9227 Front Beach Road, Panama City Beach, Florida 32407, and has appeared in this action through counsel.

11. At all times relevant to this action, Jai Ambai owned, operated, managed, and supervised the Summer Breeze Motel located at 9227 Front Beach Road, Panama City Beach, Florida 32407 (the "Summer Breeze"). Jai Ambai controlled the training, policies, and decisions on implementation and execution at the Summer Breeze.

12. Defendant Shivam and Saajan Corp ("Shivam and Saajan") is a Florida profit corporation with its principal place of business at 9300 Front Beach Road, Panama City Beach, Florida 32407. Shivam and Saajan may be served through its registered agent, Rita Patel, at 9300 Front Beach Road, Panama City Beach, Florida 32407, and has appeared in this action through counsel.

13. At all times relevant to this action, Shivam and Saajan owned, operated, managed, and supervised Cook's Motel located at 9300 Front Beach Road, Panama City Beach, Florida 32407 ("Cook's Motel"). Shivam and Saajan controlled the training, policies, and decisions at Cook's Motel.

14. Defendant Resort Hospitality Enterprises, Ltd. ("Resort Hospitality") is a Florida limited partnership with its principal place of business at 1022 West 23rd Street, 3rd Floor, Panama City, Florida 32405. Resort Hospitality may be served through its registered agent, Lauretta J. Pippin, at 1022 West 23rd Street, 3rd Floor, Panama City, Florida 32405.

15. At all times relevant to this action, Resort Hospitality owned, operated, managed, and supervised the Boardwalk Beach Hotel located at 9600 Thomas Drive, Panama City Beach, Florida 32408 (the "Boardwalk").

16. Defendant Royal American Development, Inc. ("Royal American") is a Florida profit corporation with its principal place of business at 1022 West 23rd Street, 3rd Floor, Panama City, Florida 32405. Royal American may be served through its registered agent, Lauretta J. Pippin, at 1022 West 23rd Street, 3rd Floor, Panama City, Florida 32405.

17. At all times relevant to this action, Royal American was the sole general partner of Resort Hospitality and, in that capacity, managed and controlled Resort Hospitality's business, including the day-to-day operation of the Boardwalk. Royal American shares Resort Hospitality's office address and registered agent. Police dispatch records for the Boardwalk property in 2016 refer to a "Royal American Welcome Center" on the property.

18. Defendant Karen Grant Resort Properties, LLC ("Karen Grant") is a Florida limited liability company with its principal place of business at 114 Carolyn Avenue, Panama City Beach, Florida 32407. Karen Grant may be served through its registered agent, Karen T. Grant, at 114 Carolyn Avenue, Panama City Beach, Florida 32407.

19. At all times relevant to this action, Karen Grant owned, operated, managed, and supervised the Executive Inn located at 9424 Front Beach Road, Panama City Beach, Florida 32407 (the "Executive Inn").

20. Defendant Satnam Hotel, LLC ("Satnam") is a Florida limited liability company with its principal place of business at 435 N. Tyndall Parkway, Panama City, Florida 32404. Satnam may be served through its registered agent, Akshat J. Bhakta, at 435 N. Tyndall Parkway, Panama City, Florida 32404, and has appeared in this action through counsel.

21. At all times relevant to this action, Satnam owned, operated, managed, and supervised the Days Inn Panama City/Callaway located at 435 N. Tyndall Parkway, Callaway, Florida 32404 (the "Days Inn"), which it operated as a franchisee under the Days Inn brand.

22. Whenever reference is made in this Amended Complaint to any act, deed, knowledge, or conduct of a Defendant, the allegation is that the Defendant engaged in the act, deed, or conduct, or acquired the knowledge, by or through one

or more of its owners, officers, directors, partners, managers, agents, employees, or representatives acting within the course and scope of their agency or employment.

**C. Personal Jurisdiction Over Defendants**

23. The Court may properly exercise personal jurisdiction over all Defendants.

24. Each Defendant is organized under the laws of Florida and maintains its principal place of business in Bay County, Florida. Each Defendant owned, operated, or controlled a subject hotel in Bay County, Florida, where Plaintiff was trafficked; caused injuries to Plaintiff in Florida; and profited from the trafficking of Plaintiff in Florida.

## II. SUBJECT MATTER JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States, namely 18 U.S.C. § 1595.

26. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the federal claims that they form part of the same case or controversy.

27. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because all Defendants reside in this District and a substantial

part of the events and omissions giving rise to Plaintiff's claims occurred at the subject hotels in Bay County, Florida.

## III. PLAINTIFF'S SEX TRAFFICKING

### A. Traffickers Targeted Plaintiff When She Was a Vulnerable Child

28. When Plaintiff was approximately fourteen or fifteen years old, after she ran away, she was first forced to engage in commercial sex. The person who first trafficked her was her foster mother's son, who is identified in this Amended Complaint by his initials, "G.G."

29. G.G.'s cousin, who is identified in this Amended Complaint by his initials, "K.W.," also trafficked Plaintiff.

30. Plaintiff was thus first trafficked for commercial sex, and first sexually battered, when she was under the age of sixteen, and she remained in a cycle of trafficking from that point forward.

### B. Plaintiff's Traffickers

31. G.G. and K.W. trafficked Plaintiff at the Summer Breeze, Cook's Motel, and the Boardwalk. In 2016, Plaintiff fell under the control of a third trafficker, who is identified in this Amended Complaint by his initials, J.L. G.G., K.W., J.L., and the people they posted to watch Plaintiff are referred to collectively in this Amended Complaint as "Plaintiff's traffickers." At each of the subject hotels, Plaintiff was controlled by one or more of Plaintiff's traffickers.

32. Each sex buyer who purchased Plaintiff for commercial sex at the subject hotels patronized and solicited her within the meaning of 18 U.S.C. § 1591(a)(1) and, upon information and belief, did so knowing or in reckless disregard of the visible signs that she was being compelled by force, threats of force, fraud, and coercion. Each such buyer was therefore also one of Plaintiff's traffickers.

33. Plaintiff's traffickers advertised Plaintiff for commercial sex on Backpage.com.

### C. Plaintiff's Traffickers Used Force, Threats of Force, Fraud, and Coercion to Cause Plaintiff to Engage in Commercial Sex Acts

34. Plaintiff's traffickers beat her to keep her compliant, including at the subject hotels. This made Plaintiff afraid to leave. Because of the beatings, Plaintiff was often visibly bruised at the subject hotels.

35. Plaintiff's traffickers required her to bring in between about $1,500 and $5,000 a day in commercial sex income. At times, they did not let her sleep until she made her quota. When she did not meet the quota, they threatened her or beat her.

36. Plaintiff's traffickers took all of the money she was forced to earn.

37. Plaintiff was forced to use cocaine, heroin, marijuana, and alcohol and was kept on those substances as a means of control. As a result, Plaintiff was visibly high or drunk at times while she was at the subject hotels.

38. Plaintiff's traffickers took her Social Security card and her birth certificate and would not give them back. They let her keep her state identification card because they made her use it to rent rooms in her own name. They also controlled the room keys.

39. Plaintiff was constantly watched. A trafficker was with her at all times, including whenever she was in a hotel lobby or walking the grounds. When none of them could be there, they posted an associate to watch her room. Her traffickers stood next to her when she checked into hotels and screened buyers before they came to her room, as described in ¶¶ 43, 45, 47, 52, 53, and 55.

40. Plaintiff was in fear of severe bodily injury or death if she did not comply with her traffickers' directives.

**D. How Plaintiff's Traffickers Operated at the Hotels**

**1. G.G.'s and K.W.'s Practices**

41. When G.G. and K.W. kept Plaintiff at a hotel, they generally followed the same practices, described in ¶¶ 42–48.

42. G.G. and K.W. sold Plaintiff through advertisements on Backpage.com, which they sometimes paid for with prepaid gift cards. Buyers typically contacted Plaintiff on a phone that she carried and that her traffickers monitored.

43. G.G. and K.W. made Plaintiff check in at the front desk herself, in person, using her own government identification, while one of them stood right next

to her. G.G. and K.W. were not registered as guests of the room, but they held the room key. They told her exactly what to say, including to ask for two keys and to tell the clerk that two people would be staying in the room. If she did not say it exactly as instructed, K.W. beat her once they got to the room. At the front desk, Plaintiff kept her head down and did not make eye contact with the clerk.

44. G.G. and K.W. always rented rooms in person, usually one night at a time and sometimes for a few nights. Plaintiff paid for the first night at the front desk. After that, a trafficker went to the front desk and paid to renew the room. They paid mostly in cash, and once or twice with what was left on a prepaid gift card bought to pay for Backpage advertisements. The money used to pay for the rooms came from Plaintiff's commercial sex.

45. Buyers came directly to Plaintiff's room and did not stop at the front desk. Upon information and belief, none of them was a registered guest. Often, before a buyer came to the room, a trafficker went out and waited in the lobby or nearby to make sure the buyer was not police, and then told Plaintiff the buyer could come in. Plaintiff then gave the buyer the room number.

46. G.G. and K.W. did not let housekeeping into the room, and Plaintiff's trafficker told staff not to bother the room. Instead, Plaintiff had to put used towels outside the door and ask for fresh ones, which housekeeping staff handed to her at

the door without coming in. She asked for fresh towels and washcloths every couple of days and asked for extras each time.

47. G.G., K.W., or one of their associates was with Plaintiff or watching her room at all times. Plaintiff was rarely allowed out of the room except to get something to eat or drink, and then usually only with a trafficker.

48. Plaintiff's traffickers required her to meet a daily quota and took all of the money she earned, as described in ¶¶ 35–36.

**2. J.L.'s Practices**

49. J.L. first met Plaintiff while she was still under G.G.'s control. On one occasion, posing as a buyer, he called Plaintiff through her advertisement, and her trafficker sent her to his room at the Days Inn. When J.L. refused to pay and Plaintiff tried to leave, he attacked her, as described in ¶¶ 102–106.

50. In or around the summer of 2016, after J.L. was released from jail, Plaintiff argued with G.G. and escaped. She then came under J.L.'s control. From then until they were arrested together in Ohio on or around November 2016, J.L. controlled her.

51. When J.L. kept Plaintiff at a hotel, he generally followed the same practices described in ¶¶ 52–55. J.L. sold Plaintiff through advertisements on Backpage.com. Buyers called or texted Plaintiff, and J.L. sat with her and listened to how she handled and screened each call.

52. When J.L. rented a room, Plaintiff checked in at the front desk using her own identification while J.L. stood with her at the desk. Every room Plaintiff had with J.L. was paid for in cash.

53. While buyers came to the room, J.L. sat outside, for example in a chair by the pool, where he could watch Plaintiff's room. He watched each buyer pull into the parking lot and then texted Plaintiff either that the buyer could come in or that she should not take the call. Plaintiff then gave the buyer the room number.

54. J.L. did not let housekeeping into the room. He had Plaintiff put used towels outside the door and tell staff how many towels and washcloths she needed, and she met housekeeping at the door to get them while J.L. stayed in the room, where he could hear and see everything.

55. J.L. was always with Plaintiff; she was never alone. He did not let her leave the room unless he was with her. He did not let her keep any of the money she earned.

**E. Plaintiff Was Trafficked at the Subject Hotels**

56. From approximately late 2015 through November 2016, Plaintiff's traffickers trafficked her at each of the subject hotels. Each of them, while he controlled Plaintiff, used the practices described for him in ¶¶ 41–55. G.G. and K.W. moved Plaintiff back and forth among the Summer Breeze, Cook's Motel, and the Boardwalk, which are close together in Panama City Beach. After J.L. took control

of Plaintiff, he trafficked her at the Summer Breeze and the Boardwalk. Plaintiff's traffickers also kept her at the Executive Inn in 2016. In April 2016, while G.G. was selling her, Plaintiff was sent to J.L.'s room at the Days Inn, where he attacked her, as described in ¶¶ 102–106.

57. During her captivity at the subject hotels, Plaintiff was raped, beaten, verbally abused, drugged, deprived of sleep and food, psychologically tormented, and held against her will in connection with the sex trafficking ventures at the subject hotels.

**1. Summer Breeze Motel**

58. The Summer Breeze was the first subject hotel at which Plaintiff was trafficked. G.G. and K.W. kept her there repeatedly, a few days at a time, alternating with stays at Cook's Motel across the street and stays at the Boardwalk.

59. At the Summer Breeze, G.G. and K.W. rented and renewed rooms in the manner described in ¶ 44. Plaintiff paid for the first night at the front desk, and her trafficker returned to the front desk to pay for each additional night, mostly in cash and once or twice with what was left on a prepaid gift card.

60. At the Summer Breeze, G.G. and K.W. followed the check-in practice described in ¶ 43. Plaintiff's traffickers made her check in at the front desk herself, using her own government identification, while G.G. or K.W. stood right next to her.

G.G. and K.W. were not registered guests, but they kept a key to the room. At the front desk, Plaintiff kept her head down and did not make eye contact with the clerk.

61. At the Summer Breeze, G.G. and K.W. sent a steady stream of buyers to Plaintiff's room, ten to twelve a day, in the manner described in ¶¶ 42 and 45. The buyers came directly to her room and did not stop at the front desk. Upon information and belief, none of them was a registered guest.

62. At the Summer Breeze, G.G., K.W., or one of the traffickers' associates was with Plaintiff or watching her room at all times as described in ¶ 47.

63. At the Summer Breeze, Plaintiff's traffickers did not let housekeeping in, as described in ¶ 46, and Plaintiff's traffickers told staff not to bother the room. Instead, Plaintiff had to put used towels outside the door and ask for fresh ones. She asked for fresh towels and washcloths every couple of days and asked for extras each time, and housekeeping staff handed them to her at the door without coming in.

64. At the Summer Breeze, Plaintiff's appearance and demeanor showed that something was wrong. She is five feet one inch tall and weighed only about 100 to 120 pounds, because she ate only once or twice a day and was kept on drugs. She was often deprived of sleep. She kept her head down and would not make eye contact with staff.

65. Plaintiff was visibly injured at the Summer Breeze. During one stay she had a black eye and a split lip. Her traffickers beat her severely at the Summer

Breeze. At times the abuse in the room was loud enough to be heard outside it, and no one who heard it got involved.

66. On one occasion at the Summer Breeze, a sex buyer tried to rape Plaintiff. After a long and physically violent struggle, Plaintiff finally reached the window and signaled her trafficker, who came into the room and fought the buyer. The attack left Plaintiff with bruises on the side of her face and a cut above her eye.

67. A Summer Breeze housekeeper was outside the room when the fight happened. Plaintiff's trafficker told the staff that everything was fine, and they went about their business. No one from the Summer Breeze checked on Plaintiff, and no one called the police.

68. Other traffickers worked out of the Summer Breeze at the same time. A pimp who was staying in another room at the Summer Breeze contacted Plaintiff through her advertisement, came into her room, and tried to recruit her to work for him.

69. At the Summer Breeze, Plaintiff connected to the hotel's Wi-Fi network.

70. No Summer Breeze employee ever asked Plaintiff whether she was safe or needed help. The Summer Breeze never threatened to evict Plaintiff or her traffickers and never refused them a room.

71. In the summer of 2016, after J.L. took control of Plaintiff, he also trafficked her at the Summer Breeze, in the manner described in ¶¶ 49–55. Plaintiff rented the room at the front desk in her own name, using her own identification, while J.L. stood with her, and the room was paid for in cash.

**2. Cook's Motel**

72. G.G. and K.W. trafficked Plaintiff at Cook's Motel, off and on. They typically kept her there a few days at a time.

73. At Cook's Motel, G.G. and K.W. rented rooms in the manner described in ¶ 44. Plaintiff's traffickers rented the room in person, usually one night at a time. The rooms were paid for mostly in cash.

74. At Cook's Motel, Plaintiff's traffickers followed the check-in practice described in ¶ 43. Plaintiff checked in at the front desk herself, using her own government identification, while G.G. or K.W. stood right next to her. G.G. and K.W. were not registered as guests, but they kept a key to the room.

75. At Cook's Motel, G.G. and K.W. sent a steady stream of buyers to Plaintiff's room in the manner described in ¶¶ 42 and 45. Upon information and belief, none of the buyers were registered guests.

76. At Cook's Motel, G.G., K.W., or one of their associates was with Plaintiff or watching her room at all times, as described in ¶ 47.

77. At Cook's Motel, G.G. and K.W. kept housekeeping out of the rooms as described in ¶ 46. Plaintiff put used towels outside the door and asked for fresh ones, and Cook's Motel's housekeeping staff handed them to her at the door without coming in.

78. At Cook's Motel, Plaintiff's appearance and demeanor showed that something was wrong. She is five feet one inch tall and weighed only about 100 to 120 pounds, because she ate only once or twice a day and was kept on drugs. She was often deprived of sleep. She kept her head down and would not make eye contact with staff.

79. Plaintiff recalls asking a Cook's Motel housekeeper for help. She did not help Plaintiff.

80. Plaintiff's traffickers beat her at Cook's Motel because she had talked to the housekeeper. Cook's Motel continued to rent rooms to Plaintiff and her trafficker after this incident.

81. Plaintiff was visibly bruised at Cook's Motel. At times the abuse in the room was loud enough to be heard outside it, and no one who heard it got involved.

82. One of Cook's Motel's front desk clerks knew Plaintiff's trafficker and talked with him.

83. Cook's Motel's staff threatened to evict Plaintiff and her traffickers because they were too loud and had too much traffic coming in and out of the room. But Cook's Motel did not evict them. It kept renting rooms to them.

84. At Cook's Motel, Plaintiff connected to the hotel's Wi-Fi network.

85. No Cook's Motel employee ever asked Plaintiff whether she was safe or needed help.

**3. Boardwalk Beach Hotel**

86. G.G. and K.W. trafficked Plaintiff at the Boardwalk a few times, for a few days at a time, in 2016.

87. At the Boardwalk, Plaintiff's traffickers rented the room in person and paid for it with the proceeds of Plaintiff's commercial sex. Upon information and belief, G.G. and K.W. followed the rental and check-in practices described in ¶¶ 43–44 at the Boardwalk.

88. G.G. and K.W. sold Plaintiff to buyers who came to her room at the Boardwalk. Upon information and belief, they did so in the manner described in ¶¶ 42 and 45, and none of the buyers was a registered guest.

89. At the Boardwalk, G.G., K.W., or one of their associates was with Plaintiff or watching her room at all times, as described in ¶ 47.

90. At the Boardwalk, Plaintiff's appearance and demeanor showed that something was wrong. She is five feet one inch tall and weighed only about 100 to

120 pounds, because she ate only once or twice a day and was kept on drugs. She was at times deprived of sleep. She kept her head down and would not make eye contact with staff.

91. At the Boardwalk, Plaintiff connected to the hotel's Wi-Fi network, for which she had to call the front desk.

92. No Boardwalk employee ever asked Plaintiff whether she was safe or needed help.

93. In or around July 2016, J.L. brought Plaintiff back to the Boardwalk. J.L. sold Plaintiff for sex out of that room, in the manner described in ¶¶ 49–55.

**4. Executive Inn**

94. In 2016, Plaintiff's traffickers trafficked Plaintiff at the Executive Inn, where she stayed for a couple of days.

95. At the Executive Inn, Plaintiff's traffickers rented the room in person and paid for it in cash with the proceeds of Plaintiff's commercial sex.

96. At the Executive Inn, Plaintiff checked in at the front desk herself while her trafficker stood next to her, following the check-in practices described in ¶¶ 43 and 52.

97. At the Executive Inn, Plaintiff's traffickers sold Plaintiff through Backpage advertisements to buyers who came to her room, in the manner described

in ¶¶ 42, 45, 51, and 53. Upon information and belief, none of the buyers was a registered guest.

98. At the Executive Inn, one of Plaintiff's traffickers or someone they posted was with Plaintiff or watching her room at all times, and she was kept in the room nearly all the time, as described in ¶¶ 47 and 55.

99. Upon information and belief, at the Executive Inn, Plaintiff's traffickers told staff not to bother the room.

100. At the Executive Inn, Plaintiff's appearance and demeanor showed that something was wrong. She is five feet one inch tall and weighed only about 100 to 120 pounds, because she ate only once or twice a day and was kept on drugs. She was often deprived of sleep. She kept her head down and would not make eye contact with staff. She was also visibly bruised while she was at the Executive Inn.

101. No Executive Inn employee ever asked Plaintiff whether she was safe or needed help.

**5. Days Inn Panama City/Callaway**

102. In April 2016, while G.G. was selling Plaintiff, she was sent on an outcall to J.L.'s room, Room 123, at the Days Inn, as described in ¶ 49. Upon information and belief, J.L. was the registered guest of Room 123, and Plaintiff recalls coming to it as a visitor. J.L. started an altercation with Plaintiff inside the room. Plaintiff fled the room, and J.L. chased after her.

103. When Plaintiff came to the Days Inn that night, she was visibly underweight and appeared malnourished. She is five feet one inch tall and weighed only about 100 to 120 pounds.

104. J.L. struck Plaintiff with his hands, bruising her head and neck. In the Days Inn lobby, he slammed her head on the floor, injuring her.

105. The Days Inn employee working the front desk witnessed the attack and called the Bay County Sheriff's Office.

106. Deputies arrested J.L. at the Days Inn. When he was searched at the jail, staff found in his pocket a white hotel key envelope containing marijuana.

107. In the late summer or fall of 2016, after J.L. had taken control of Plaintiff and had been selling her for sex in Panama City Beach, J.L. brought Plaintiff back to the Days Inn and kept her there overnight. The Days Inn was the last subject hotel at which Plaintiff was kept before J.L. took her to Ohio.

108. When J.L. brought Plaintiff back, he was the same man the Days Inn's clerk had watched slam Plaintiff's head against the lobby floor months earlier, who had been arrested on the property, and whom a court had ordered to have no contact with her. After the April 2016 attack, Days Inn staff told Plaintiff that she was not allowed to come back to the Days Inn. Upon information and belief, the Days Inn placed Plaintiff on a do-not-rent list because of that incident. Upon information and

belief, the Days Inn nonetheless rented a room to J.L. and Plaintiff when he brought her back and let Plaintiff stay there.

109. J.L. kept Plaintiff at the Days Inn that night, so that he could continue selling her. Upon information and belief, the room was paid for in cash with the proceeds of Plaintiff's commercial sex, as every room she had with J.L. was (¶ 52).

110. Upon information and belief, Plaintiff checked in at the front desk with J.L. standing next to her, as she did at other hotels while he controlled her (¶ 52).

111. The next morning, J.L. transported Plaintiff from the Days Inn to Ohio, where he continued to sell her for sex until they were arrested together on or around November of 2016.

112. While Plaintiff was at the Days Inn, J.L. was with her at all times, as described in ¶ 55, and she stayed in the room.

113. During the later Days Inn stay, Plaintiff's appearance and demeanor showed that something was wrong. She is five feet one inch tall and weighed only about 100 to 120 pounds, because she ate only once or twice a day and was kept on drugs. She was often deprived of sleep. She kept her head down and would not make eye contact with staff.

114. No Days Inn employee asked Plaintiff whether she was safe or needed help.

### F. Plaintiff's Trafficking Was Continuous and Did Not End Until on or Around November 2016

115. Plaintiff's trafficking was a single, continuous course of conduct that lasted from the time she was a child until on or around November 2016. There was no break in it. Plaintiff passed directly from G.G. and K.W. to J.L. Whether she was at one of the subject hotels, between them, or elsewhere, Plaintiff remained under a trafficker's control, subject to violence, and forced to meet quotas.

## IV. DEFENDANTS PARTICIPATED IN VENTURES

116. Each Defendant participated in two ventures: (1) a hotel operating venture with the owners, managers, and staff of its hotel, through which the hotel rented rooms for profit; and (2) a venture with Plaintiff's traffickers, with whom it had a continuous business relationship and a direct association through the repeated rental and renewal of the rooms in which Plaintiff was harbored and sold.

### A. Jai Ambai and Summer Breeze Motel

117. Jai Ambai participated in a venture to operate the Summer Breeze. The venture included Jai Ambai and the Summer Breeze's owners, managers, front desk staff, housekeeping and janitorial staff, maintenance workers, and other employees. The venture rented rooms to the public for profit, a common undertaking involving risk and potential profit.

118. Jai Ambai also participated in a venture with Plaintiff's traffickers. Jai Ambai had a continuous business relationship and a direct association with Plaintiff's traffickers, in which it rented rooms to them, or to Plaintiff at the traffickers' direction, one night at a time and renewed those rentals day after day on multiple stays. Each renewal was a fresh decision by Jai Ambai to continue that relationship.

119. Jai Ambai was closely involved in the daily operation of the Summer Breeze. Its staff dealt directly with Plaintiff and her traffickers at the front desk, took payment for each night's rental, and handed Plaintiff fresh and extra towels at the door of the room in which she was kept.

120. Jai Ambai aided Plaintiff's traffickers, including in the following ways:

a. it rented and re-rented rooms to Plaintiff's traffickers, or to Plaintiff at their direction, night after night, while the signs described in ¶¶ 58–71 were in plain view;

b. its front desk staff checked Plaintiff in while one of her traffickers stood next to her and did not make the trafficker register as a guest. Plaintiff kept her head down and avoided eye contact, and the front desk staff never asked whether she was safe;

c. its staff stayed out of Plaintiff's room at her traffickers' direction, handing fresh and extra towels to her at the door;

d. when a sex buyer attacked Plaintiff in her room and her trafficker fought the buyer, its staff accepted the trafficker's word that everything was fine and went about their business;

e. it allowed other traffickers to operate out of its rooms at the same time; and

f. it never evicted Plaintiff's traffickers, never refused them a room, and never reported them to law enforcement.

**B. Shivam and Saajan and Cook's Motel**

121. Shivam and Saajan participated in a venture to operate Cook's Motel. The venture included Shivam and Saajan and Cook's Motel's owners, managers, front desk staff, housekeeping, security personnel, and janitorial staff, maintenance workers, and other employees. The venture rented rooms to the public for profit, a common undertaking involving risk and potential profit.

122. Shivam and Saajan also participated in a venture with Plaintiff's traffickers. Shivam and Saajan had a continuous business relationship and a direct association with Plaintiff's traffickers, in which it rented rooms to them, or to Plaintiff at the traffickers' direction, one night at a time and renewed those rentals

day after day on multiple stays. Each renewal was a fresh decision by Shivam and Saajan to continue that relationship.

123. Shivam and Saajan was closely involved in the daily operation of Cook's Motel. Its staff dealt directly with Plaintiff and her traffickers at the front desk, took payment for each night's rental, and handed Plaintiff fresh and extra towels at the door of the room in which she was kept.

124. Shivam and Saajan aided Plaintiff's traffickers, including in the following ways:

a. it rented and re-rented rooms to Plaintiff's traffickers, or to Plaintiff at their direction, night after night, while the signs described in ¶¶ 72–85 were in plain view;

b. its front desk staff checked Plaintiff in while one of her traffickers stood next to her. The front desk staff did not require her trafficker to register as a guest. Plaintiff kept her head down and avoided eye contact, and the front desk staff never asked whether she was safe;

c. its housekeeper refused Plaintiff's plea for help;

d. its front desk clerk knew and talked with Plaintiff's trafficker;

e. its staff stayed out of Plaintiff's room at her traffickers' direction, handing fresh and extra towels to her at the door;

f. after threatening to evict Plaintiff and her traffickers for the noise and the traffic of men in and out of the room, it kept renting rooms to them; and

g. it never reported Plaintiff's traffickers to law enforcement.

**C. Resort Hospitality and Boardwalk Beach Hotel**

125. Resort Hospitality participated in a venture to operate the Boardwalk. The venture included Resort Hospitality, its general partner Royal American, and the Boardwalk's owners, managers, front desk staff, housekeeping and janitorial staff, maintenance workers, security personnel, and other employees. The venture rented rooms to the public for profit, a common undertaking involving risk and potential profit.

126. Resort Hospitality also participated in a venture with Plaintiff's traffickers. Resort Hospitality had a continuous business relationship and a direct association with Plaintiff's traffickers, in which it rented rooms to them, or to Plaintiff at the traffickers' direction, and renewed those rentals on a few stays. Each renewal was a fresh decision by Resort Hospitality to continue that relationship.

127. Resort Hospitality was closely involved in the daily operation of the Boardwalk. Its staff dealt directly with Plaintiff and her traffickers at the front desk, took payment for the rentals, and gave Plaintiff access to the hotel's Wi-Fi network when she called the front desk for it.

128. Resort Hospitality aided Plaintiff's traffickers, including in the following ways:

a. it rented and re-rented rooms to Plaintiff's traffickers, or to Plaintiff at their direction, while the signs described in ¶¶ 86–93 were in plain view;

b. its front desk staff checked Plaintiff in while one of her traffickers stood next to her. The front desk staff did not require her trafficker to register as a guest. Plaintiff kept her head down and avoided eye contact, and the front desk staff never asked whether she was safe;

c. its front desk gave Plaintiff access to the hotel's Wi-Fi network, which, upon information and belief, was used in arranging the commercial sex acts for which she was sold; and

d. it never evicted Plaintiff's traffickers, never refused them a room, and never reported them to law enforcement.

129. Royal American participated in the Boardwalk hotel operating venture as Resort Hospitality's sole general partner. Royal American managed and controlled Resort Hospitality's business, including the operation of the Boardwalk, and, upon information and belief, directed the Boardwalk's policies, staffing,

training, and security, and maintained a physical presence on the property through the "Royal American Welcome Center."

130. Through its management and control of the Boardwalk, Royal American took part in, and directed, the Boardwalk's continuous business relationship with Plaintiff's traffickers described in ¶¶ 125–128.

**D. Karen Grant and Executive Inn**

131. Karen Grant participated in a venture to operate the Executive Inn. The venture included Karen Grant and the Executive Inn's owners, managers, front desk staff, housekeeping and janitorial staff, maintenance workers, security personnel, and other employees. The venture rented rooms to the public for profit, a common undertaking involving risk and potential profit.

132. Karen Grant also participated in a venture with Plaintiff's traffickers. Karen Grant had a continuous business relationship and a direct association with Plaintiff's traffickers, in which it rented rooms to them, or to Plaintiff at the traffickers' direction, for a stay of a couple of days. Each rental was a decision by Karen Grant to do business with Plaintiff's traffickers.

133. Karen Grant was closely involved in the daily operation of the Executive Inn. Its staff dealt directly with Plaintiff and her traffickers at the front desk and took payment for the rental.

134. Karen Grant aided Plaintiff's traffickers, including in the following ways:

a. it rented a room to Plaintiff's traffickers, or to Plaintiff at their direction, for a couple of days while the signs described in ¶¶ 94–101 were in plain view;

b. its front desk staff checked Plaintiff in while her trafficker stood next to her. The front desk staff did not require Plaintiff's trafficker to register as a guest. Plaintiff kept her head down and avoided eye contact, and the front desk staff never asked whether she was safe;

c. its staff did nothing although Plaintiff was visibly bruised and was kept in her room nearly all the time; and

d. it never evicted Plaintiff's traffickers, never refused them a room, and never reported them to law enforcement.

**E. Satnam and Days Inn Panama City/Callaway**

135. Satnam participated in a venture to operate the Days Inn. The venture included Satnam and the Days Inn's owners, managers, front desk staff, housekeeping and janitorial staff, maintenance workers, security personnel, and other employees. The venture rented rooms to the public for profit, a common undertaking involving risk and potential profit.

136. Satnam also participated in a venture with Plaintiff's traffickers. Satnam had a continuous business relationship and a direct association with J.L., to whom it rented a room in April 2016, when Plaintiff was sent to his room on an outcall, and to whom, or to Plaintiff at his direction, it rented a room again in the late summer or fall of 2016, after its own clerk had watched him beat Plaintiff in its lobby and deputies had arrested him on its property. This was a fresh decision by Satnam to continue that relationship.

137. Satnam was closely involved in the daily operation of the Days Inn. Upon information and belief, its staff dealt directly with Plaintiff and J.L. at the front desk and took payment for the night's rental, and in April of 2016, its front desk clerk watched J.L. beat Plaintiff in its lobby.

138. Satnam aided Plaintiff's traffickers, including in the following ways:

a. it rented a room to J.L., or to Plaintiff at his direction, again in the late summer or fall of 2016, after the events described in ¶¶ 102–106;

b. upon information and belief, its front desk staff checked Plaintiff in while J.L. stood next to her but did not require J.L. to register as a guest. Plaintiff kept her head down and avoided eye contact, and the front desk staff never asked whether she was safe;

c. after its own front desk clerk watched J.L. slam Plaintiff's head against the lobby floor in April of 2016, as described in ¶¶ 102–106, it did nothing to protect Plaintiff from him and, upon information and belief, rented a room to J.L. and Plaintiff again when he brought her back in the late summer or fall of 2016, even though its staff had told Plaintiff she was not allowed to come back and, upon information and belief, she was on its do-not-rent list; and

d. apart from its clerk's call to the Sheriff's Office in April of 2016, it did not report Plaintiff's traffickers to law enforcement, evict them, or refuse them a room.

## V. DEFENDANTS KNOWINGLY BENEFITTED FROM THE VENTURES

### A. Room Revenue

139. Jai Ambai knowingly benefitted from the ventures because it knowingly received payment every time it rented or renewed a room in which Plaintiff was harbored and sold at the Summer Breeze. Plaintiff's traffickers paid for those rooms with the proceeds of Plaintiff's trafficking.

140. Shivam and Saajan knowingly benefitted from the ventures because it knowingly received payment every time it rented or renewed a room in which

Plaintiff was harbored and sold at Cook's Motel. Plaintiff's traffickers paid for those rooms with the proceeds of Plaintiff's trafficking.

141. Resort Hospitality knowingly benefitted from the ventures because it knowingly received payment every time it rented or renewed a room in which Plaintiff was harbored and sold at the Boardwalk. Plaintiff's traffickers paid for those rooms with the proceeds of Plaintiff's trafficking.

142. Karen Grant knowingly benefitted from the ventures because it knowingly received payment every time it rented or renewed a room in which Plaintiff was harbored and sold at the Executive Inn. Plaintiff's traffickers paid for those rooms with the proceeds of Plaintiff's trafficking.

143. Satnam knowingly benefitted from the ventures because it knowingly received payment for the room to which Plaintiff was sent on an outcall in April 2016 and for the room in which J.L. harbored Plaintiff in the late summer or fall of 2016. J.L. paid for the later room with the proceeds of Plaintiff's trafficking.

144. Royal American knowingly benefitted from the Boardwalk ventures because, as Resort Hospitality's general partner, it shared in the revenue and profits of the Boardwalk, including the revenue from the rooms in which Plaintiff was trafficked, and, upon information and belief, received management or other fees tied to the Boardwalk's operation.

**B. Other Benefits Common to All Defendants**

145. Plaintiff connected to the Wi-Fi networks at the Summer Breeze, Cook's Motel, and the Boardwalk; at the Boardwalk, she had to call the front desk to get access. Upon information and belief, each Defendant received revenue from amenities, including Wi-Fi service, that Plaintiff's traffickers used to post and respond to the online advertisements through which Plaintiff was sold.

146. Each Defendant also knowingly benefitted from the ventures by keeping its operating costs low instead of taking reasonable steps to detect and stop sex trafficking at its hotel. Each Defendant reduced costs by:

a. limiting the training that managers and employees received on how to recognize the signs of human trafficking and what steps to take;

b. ignoring and refusing to act on information, including guest reviews and police activity, indicating that sex trafficking, prostitution, and drug activity were occurring at its hotel; and

c. failing to employ appropriate security measures to combat human trafficking and sexual exploitation.

147. Each Defendant also received other things of value from the ventures, including continued room occupancy and repeat business.

## VI. THE VENTURES VIOLATED 18 U.S.C. § 1591

148. When Plaintiff's traffickers brought her to each subject hotel, the ventures described in Section IV knowingly harbored, maintained, patronized, and/or solicited Plaintiff, knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, or a combination of such means would be used to cause Plaintiff to engage in commercial sex acts.

### A. The Summer Breeze Rented Rooms That Harbored and Maintained Plaintiff

149. Jai Ambai and its managers, staff, and employees rented rooms at the Summer Breeze in which Plaintiff was kept and sold, and thereby knowingly harbored and maintained Plaintiff.

150. The Summer Breeze's staff knew Plaintiff was staying in the rooms rented for Plaintiff's traffickers because Plaintiff checked in at the front desk herself, using her own identification, with one of her traffickers standing next to her; her trafficker renewed the rentals at the front desk day after day; and staff handed Plaintiff fresh and extra towels at the door of the room. *See* ¶¶ 58–71.

151. Jai Ambai and its staff knew, or were in reckless disregard of the fact, that Plaintiff was engaging in commercial sex acts at the Summer Breeze, because of the ten to twelve unregistered men who came to a single room each day; the traffickers' refusal to let housekeeping into the room; the constant requests for fresh

and extra towels; the one-night-at-a-time rentals paid in cash; and another pimp operating out of a different room at the motel at the same time.

152. Jai Ambai and its staff also knew, or were in reckless disregard of the fact, that force, threats of force, fraud, and coercion were being used to cause Plaintiff to engage in those commercial sex acts, because Plaintiff walked the property with a black eye and a split lip; a buyer's attack on Plaintiff, and her trafficker's fight with the buyer, took place in her room while a Summer Breeze housekeeper was outside, and her trafficker brushed it off; her traffickers stood next to her at check-in and controlled where she went; Plaintiff was visibly underweight, kept her head down, and would not make eye contact with staff; the abuse in the room could at times be heard outside it; and Plaintiff was visibly high and drunk at times.

**B. Cook's Motel Rented Rooms That Harbored and Maintained Plaintiff**

153. Shivam and Saajan and its managers, staff, and employees rented rooms at Cook's Motel in which Plaintiff was kept and sold, and thereby knowingly harbored and maintained Plaintiff.

154. Cook's Motel's staff knew Plaintiff was staying in the rooms rented for Plaintiff's traffickers because Plaintiff checked in at the front desk herself, using her own identification, with one of her traffickers standing next to her; her trafficker

renewed the rentals at the front desk; staff handed Plaintiff fresh and extra towels at the door of the room; and Plaintiff asked a Cook's Motel housekeeper for help.

155. Shivam and Saajan and its staff knew, or were in reckless disregard of the fact, that Plaintiff was engaging in commercial sex acts at Cook's Motel, because of the steady stream of unregistered men to a single room, which was heavy enough that Cook's Motel staff threatened to evict Plaintiff and her traffickers over it; the traffickers' refusal to let housekeeping into the room; the constant requests for fresh and extra towels; and the one-night-at-a-time rentals paid in cash.

156. Shivam and Saajan and its staff also knew, or were in reckless disregard of the fact, that force, threats of force, fraud, and coercion were being used to cause Plaintiff to engage in those commercial sex acts, because Plaintiff asked a Cook's Motel housekeeper for help; the traffickers beat her following this request; Plaintiff was visibly bruised; Cook's Motel staff complained about the noise coming from the room; Plaintiff's trafficker knew and talked with a Cook's Motel front desk clerk; her traffickers stood next to her at check-in and controlled where she went; Plaintiff was visibly underweight, kept her head down, and would not make eye contact with staff; and Plaintiff was visibly drunk and high at times.

**C. The Boardwalk Rented Rooms That Harbored and Maintained Plaintiff**

157. Resort Hospitality, its general partner Royal American, and their managers, staff, and employees rented rooms at the Boardwalk in which Plaintiff was kept and sold, and thereby knowingly harbored and maintained Plaintiff.

158. The Boardwalk's staff knew Plaintiff was staying in the rooms rented for Plaintiff's traffickers because, upon information and belief, Plaintiff checked in at the front desk herself with one of her traffickers standing next to her; her trafficker paid for the rentals at the front desk; and Plaintiff called the front desk to get access to the hotel's Wi-Fi network.

159. Resort Hospitality and its staff knew, or were in reckless disregard of the fact, that Plaintiff was engaging in commercial sex acts at the Boardwalk, because of the unregistered men who came to a single room, the rentals paid with the proceeds of Plaintiff's commercial sex, and the police activity at the Boardwalk described in ¶ 191.

160. Resort Hospitality and its staff also knew, or were in reckless disregard of the fact, that force, threats of force, fraud, and coercion were being used to cause Plaintiff to engage in those commercial sex acts, because, upon information and belief, her traffickers stood next to her at check-in and controlled where she went; Plaintiff was visibly underweight, kept her head down, and would not make eye contact with staff; Plaintiff was visibly high and drunk at times; and police calls to

the Boardwalk in the same months, described in ¶ 191, reflected violence against women and the control of women by men on its premises.

**D. The Executive Inn Rented Rooms That Harbored and Maintained Plaintiff**

161. Karen Grant and its managers, staff, and employees rented rooms at the Executive Inn in which Plaintiff was kept and sold, and thereby knowingly harbored and maintained Plaintiff.

162. The Executive Inn's staff knew Plaintiff was staying in the rooms rented for Plaintiff's traffickers because Plaintiff checked in at the front desk herself with her trafficker standing next to her and her trafficker rented the room in person and paid for it in cash.

163. Karen Grant and its staff knew, or were in reckless disregard of the fact, that Plaintiff was engaging in commercial sex acts at the Executive Inn, because of the unregistered men who came to a single room, the cash payment for the room, her trafficker's instruction to staff not to bother the room (upon information and belief), and Plaintiff's near-constant confinement to the room.

164. Karen Grant and its staff also knew, or were in reckless disregard of the fact, that force, threats of force, fraud, and coercion were being used to cause Plaintiff to engage in those commercial sex acts, because Plaintiff was visibly bruised; her trafficker stood next to her at check-in, controlled where she went, and kept her in the room nearly all the time; Plaintiff was visibly high and drunk at times,

and Plaintiff was visibly underweight, kept her head down, and would not make eye contact with staff.

**E. The Days Inn Rented Rooms That Harbored and Maintained Plaintiff**

165. Satnam and its managers, staff, and employees rented the room at the Days Inn in which J.L. kept Plaintiff overnight between commercial sex acts before transporting her to Ohio, and thereby knowingly harbored and maintained Plaintiff within the meaning of 18 U.S.C. § 1591(a)(1). No commercial sex act had to occur at the Days Inn that night: J.L. kept Plaintiff there so that he could continue selling her, which he did in Ohio until they were arrested, as described in ¶¶ 107–114.

166. Upon information and belief, the Days Inn's staff knew Plaintiff was staying in the room rented in the late summer or fall of 2016 because she checked in at the front desk with J.L. standing next to her. In April 2016, J.L. was arrested at the Days Inn carrying a white hotel key envelope, showing that he had a room there.

167. Satnam and its staff knew, or were in reckless disregard of the fact, that J.L. was holding Plaintiff at the Days Inn for the purpose of commercial sex, because of the facts described in ¶¶ 102–112, Plaintiff's appearance and demeanor described in ¶ 113, and, upon information and belief, the cash payment for the room.

168. Satnam and its staff also knew, or were in reckless disregard of the fact, that force, threats of force, fraud, or coercion would be used to cause Plaintiff to engage in commercial sex acts, because in April 2016 the Days Inn's own front desk

clerk watched J.L. beat Plaintiff in its lobby; when J.L. brought Plaintiff back in the late summer or fall of 2016, he was a man its staff had seen beat her and whom deputies had arrested on its property, and Plaintiff was a guest its staff had told not to come back and, upon information and belief, had placed on its do-not-rent list because of that incident; upon information and belief, J.L. stood next to Plaintiff at check-in and controlled where she went; and Plaintiff was visibly underweight, kept her head down, and would not make eye contact with staff; Plaintiff also was visibly high and drunk at times.

### F. The Individuals Who Saw These Signs Were Hotel Staff

169. The individuals who witnessed and observed the signs described above at each subject hotel were that hotel's staff. Plaintiff knows they were staff because she dealt with them at the front desk, because they handed her towels at the door of her room, because they wore hotel attire, uniforms, or name tags, and because they worked in employee-only areas.

## VII. DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT THE VENTURES VIOLATED 18 U.S.C. § 1591(a)

### A. Sex Trafficking at Hotels Was a Known and Widespread Problem

170. Defendants knew or should have known that sex trafficking was a widespread problem in the hospitality industry and that a significant portion of sex trafficking in the United States occurs at hotels and motels.

171. The hospitality industry is a major life source of the sex trafficking epidemic both in the United States and abroad.[1] The United Nations,[2] international non-profits,[3] and the U.S. Department of Homeland Security[4] have documented this well-known epidemic for years and have brought particular attention to the indispensable role of hotels.

172. In 2004, End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct in the United States, identifying steps companies should take to prevent sex trafficking. ECPAT-USA identified hotel-specific best practices, including: (1) not renting by the hour; (2) not

---

[1]Giovanna L. C. Cavagnaro, Sex Trafficking: The Hospitality Industry's Role and Responsibility, Cornell University School of Hotel Administration (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[2]Global Report on Trafficking in Persons, United Nations Office on Drugs and Crime (2020), available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; see also We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners, United Nations Office on Drugs and Crime (Apr. 24, 2012), available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html.

[3]The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[4]Human Trafficking and the Hospitality Industry, U.S. Department of Homeland Security (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. Department of Homeland Security (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

permitting cash payments; (3) monitoring online sex advertisements, such as those on Craigslist and Backpage, for the hotel's name and pictures of its rooms; (4) changing Wi-Fi passwords regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; and (7) requiring all visitors to be logged, including guest name, visitor name, arrival and departure times, and room number.

173. Nationwide campaigns recognized the issue of human trafficking in the hotel industry, and the lack of internal policies to address it, as early as 2010 with the Department of Homeland Security's Blue Campaign.[5] The campaign released free online resources and toolkits for the hospitality industry.

174. The passage of the Trafficking Victims Protection Act in 2000 and the TVPRA in 2008, together with numerous other legislative initiatives, put Defendants on notice of the high likelihood of sex trafficking at their hotels. By 2012, training guides and videos were available through the American Hotel & Lodging Association and ECPAT-USA, among others.

175. Defendants knew or should have known that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence

[5]DHS Blue Campaign Five Year Milestone, U.S. Department of Homeland Security (July 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

and substance abuse, and that the relationship between a trafficker and a trafficking victim involves force, fraud, and coercion.

176. Before and during the relevant period, each Defendant failed to implement sufficient educational and training programs on sex trafficking within its chain of command, and failed to implement policies for preventing, identifying, reporting, documenting, investigating, and stopping sex trafficking at its hotel.

**B. Jai Ambai Knew or Should Have Known the Venture at the Summer Breeze Violated § 1591**

177. Jai Ambai knew or should have known of the fact that the ventures at the Summer Breeze violated 18 U.S.C. § 1591(a) because its staff knew or should have known of that fact. The knowledge of Jai Ambai's managers and staff, acquired within the scope of their agency and employment, is imputed to Jai Ambai.

178. Online reviews reported prostitution, pimps, and drug activity at the Summer Breeze.

179. In a review posted on March 3, 2014, titled "SUPER SEEDY READ THIS REVIEW ABOUT THIS MOTEL!!!," a guest described stained sheets and a "roach blunt." The reviewer, who described himself as a former police officer, wrote that he called the police twice during his February 2014 stay, that the police took a man and woman he believed to be a "Pimp and Ho" to jail, and that he "got solicited

these few days from other girls, even while I was with my wife." The reviewer reported his concerns to the motel staff.


Summer Breeze Motel

Save Review

2.4 (65 reviews) #53 of 62 hotels in Panama City Beach

Reviews

Check availability

Review of Summer Breeze Motel

Davidace80 wrote a review Mar 2014

Atlanta, Georgia • 1 contribution • 18 helpful votes

SUPER SEEDY READ THIS REVIEW ABOUT THIS MOTEL!!!!!

Ok, let me start by saying this, I read reviews and they do impact my decisions and although I rarely write them unless needed and this is. I'll start with the GOOD THINGS. The mattress was unbelievably comfortable and new looking. Service was good but I only asked for 2 other pillows, since the ones placed on the bed are for show and they're round and hard. Price was ok since we had 4 dogs and 4 adults. We paid 191.00 for 3 nights after them keeping the 40.00 non refundable pet fee, so it wasn't horribly priced but I soon found out why it was so cheap. Now for the BAD THINGS . The carpet was so dirty we couldn't go barefoot and all of our socks had to be thrown away, literally I've seen children barefoot in Grocery stores whose feet were cleaner. Next was the sheets that were stained and the comforter that has rips and tears and a few large burns. NEXT, which was unbelievable to me was my 65yr old mother found what is commonly referred to as a "roach blunt" or the end of a cigar that had been filled with Marijuana and smoked in her sheets. So that was the first time I called the Police, after my mom found drugs in her bed. ALSO I mentioned we had 4 dogs so on night 2 at 3am I'm taking one of the dogs out to use the bathroom and a REALLY NICE Acura was parked in front of my door and as I walked by it the people inside were smoking weed with the windows down in public. So I went back inside the room and called the Police the 2nd time, when they arrived they took the man and woman which based on my experience as a ex-police officer I believed was a "Pimp and Ho" to Jail and the Property Owner never came out or was notified! So to me this is the norm there since I got solicited those few days from other girls, even while I was with my wife. I made a complaint to the Owner and was told we could leave anytime we want but we cant get a refund for the unused nights and after that a NO REFUND POLICY was displayed in the office. If your young and on Spring Break this is a good spot, but if your a family and worried about your safety PLZ pass this place by. Everything in my review is real and happened.

Read less

Value | Rooms | Location

Cleanliness | Service | Sleep Quality

Date of stay: February 2014

Trip type: Traveled with family

180. In a review posted on May 9, 2014, titled "terrrible place!!!!!!!," a guest warned: "prostitution was going on 3 rooms down from us, you always seen people coming in and out and drug dealers. women asking if they could perform for money."



**Summer Breeze Motel**

Save Review

2.4 (65 reviews) #53 of 62 hotels in Panama City Beach

Check availability

Reviews

Review of Summer Breeze Motel

ambersmith90 wrote a review May 2014
Columbus, Georgia • 1 contribution • 12 helpful votes

**terrrible place!!!!!!!**

stayed here last year and it was very dirty. prostitution was going on 3 rooms down from us, you always seen people coming in and out and drug dealers. women asking if they could perform for money. DO NOT GO HERE! ESPECIALLY WITH CHILDREN ITS AWFUL

**Insider tip:** do not choose here

Value | Rooms | Location
Cleanliness | Service | Sleep Quality

Date of stay: July 2013
Trip type: Traveled as a couple

This review is the subjective opinion of a Tripadvisor member and not of Tripadvisor LLC. Tripadvisor performs checks on reviews as part of our industry-leading trust & safety standards. Read our transparency report to learn more.

0

See all 65 reviews

181. Bay County Sheriff's Office records reflect repeated law enforcement responses to the Summer Breeze's address in 2016, including reports of possession of heroin with intent to sell, possession of narcotics equipment, grand theft of a controlled substance, battery, trespass, disorderly conduct, and resisting an officer, with incidents in February, April, August, September, October, November, and December of 2016.

182. Jai Ambai has admitted that it controlled the training, policies, and decisions on implementation and execution at the Summer Breeze. ECF No. 20 ¶ 43. It therefore controlled whether its staff were trained to recognize, and required to act on, the signs described above.

183. Upon information and belief, sex trafficking occurred at the Summer Breeze before Plaintiff was trafficked there.

184. Jai Ambai knew of, or with reasonable diligence would have discovered, the matters described in this subsection. Had it used reasonable care, it would have investigated them and discovered that the ventures at the Summer Breeze were violating the TVPRA as to Plaintiff.

### C. Shivam and Saajan Knew or Should Have Known the Venture at Cook's Motel Violated § 1591

185. Shivam and Saajan knew or should have known of the fact that the ventures at Cook's Motel violated 18 U.S.C. § 1591(a) as to Plaintiff because its staff knew or should have known of that fact. The knowledge of Shivam and Saajan's managers and staff, acquired within the scope of their agency and employment, is imputed to Shivam and Saajan.

186. Bay County Sheriff's Office records reflect law enforcement responses to Cook's Motel's address in every month of 2016, including reports of battery, battery causing bodily harm, domestic battery, domestic disturbances, possession of methamphetamine, possession of drug paraphernalia and narcotics equipment, a home-invasion robbery, trespass, violation of an injunction for protection, a missing person, and a welfare check.

187. Shivam and Saajan has admitted that it controlled the training, policies, and decisions at Cook's Motel. ECF No. 37 ¶ 68. It therefore controlled whether its staff were trained to recognize, and required to act on, the signs described above.

188. Upon information and belief, sex trafficking occurred at Cook's Motel before Plaintiff was trafficked there.

189. Shivam and Saajan knew of, or with reasonable diligence would have discovered, the matters described in this subsection. Had it used reasonable care, it would have investigated them and discovered that the ventures at Cook's Motel were violating the TVPRA as to Plaintiff.

**D. Resort Hospitality Knew or Should Have Known the Venture at the Boardwalk Violated § 1591**

190. Resort Hospitality knew or should have known of the fact that the ventures at the Boardwalk violated 18 U.S.C. § 1591(a) as to Plaintiff because its staff knew or should have known of that fact. The knowledge of Resort Hospitality's managers and staff, acquired within the scope of their agency and employment, is imputed to Resort Hospitality.

191. Panama City Beach Police Department dispatch records reflect 202 law enforcement events at the Boardwalk in 2016. Among them:

a. on March 19, 2016, police responded to a room at the Boardwalk where a 19-year-old woman who had come from Georgia was

upset, "in shock," did not know what had happened to her, and needed to go to the hospital;

b. on March 19, 2016, a woman in the Boardwalk lobby reported that a man would not give her belongings back "because she owes him money";

c. on March 27 and 28, 2016, a group of four men in the lobby had a verbal altercation and returned the next night to confront security in the parking lot;

d. on April 3, 2016, occupants of a car circling the Boardwalk parking lot tried to sell pills to a guest;

e. on April 5, 2016, police made an arrest at the Boardwalk involving a Glock handgun;

f. on April 7, 2016, a guest reported a physical and verbal altercation between a man and a woman in a neighboring room;

g. on May 29, 2016, four men brandished a handgun at Boardwalk security; and

h. on June 22, 2016, a woman was heard yelling for help near a guest room.

192. Upon information and belief, sex trafficking occurred at the Boardwalk before Plaintiff was trafficked there.

193. Resort Hospitality knew of, or with reasonable diligence would have discovered, the matters described in this subsection. Had it used reasonable care, it would have investigated them and discovered that the ventures at the Boardwalk were violating the TVPRA as to Plaintiff.

194. Royal American knew or should have known that the Boardwalk venture violated 18 U.S.C. § 1591(a) as to Plaintiff because, as Resort Hospitality's general partner and the entity that managed and controlled the Boardwalk, the knowledge of the Boardwalk's managers, security personnel, and staff is imputed to it, and because of the industry knowledge and police activity.

**E. Karen Grant Knew or Should Have Known the Venture at the Executive Inn Violated § 1591**

195. Karen Grant knew or should have known of the fact that the ventures at the Executive Inn violated 18 U.S.C. § 1591(a) as to Plaintiff because its staff knew or should have known of that fact. The knowledge of Karen Grant's managers and staff, acquired within the scope of their agency and employment, is imputed to Karen Grant.

196. Bay County Sheriff's Office records reflect repeated law enforcement responses to the Executive Inn's address in 2016, including reports of suspicious incidents, burglary of an occupied dwelling, strong-arm robbery, domestic battery, dealing in stolen property, grand theft, failure to register as a sex offender,

possession of drug paraphernalia, and disorderly conduct, with incidents in February, March, May, June, July, August, September, and December 2016.

197. Upon information and belief, sex trafficking occurred at the Executive Inn before Plaintiff was trafficked there.

198. Karen Grant knew of, or with reasonable diligence would have discovered, the matters described in this subsection. Had it used reasonable care, it would have investigated them and discovered that the ventures at the Executive Inn were violating the TVPRA as to Plaintiff.

### F. Satnam Knew or Should Have Known the Venture at the Days Inn Violated § 1591

199. Satnam knew or should have known of the fact that the ventures at the Days Inn violated 18 U.S.C. § 1591(a) as to Plaintiff because its staff knew or should have known that fact, as described in ¶¶ 165–169, including because its own front desk clerk watched J.L. beat Plaintiff in its lobby in April of 2016. The knowledge of Satnam's managers and staff, acquired within the scope of their agency and employment, is imputed to Satnam.

200. From the April 2016 incident alone, Satnam's front desk staff knew that Plaintiff, a visibly underweight young woman who, upon information and belief, was not a registered guest but a visitor to a room registered to J.L., was being violently abused, in and around that room, by a man who chased her out of that room

and beat her in its lobby. When J.L. brought Plaintiff back to the Days Inn in the late summer or fall of 2016, Satnam knew, or should have known, that J.L. was using force to control Plaintiff, and knew, or was in reckless disregard of the fact, that he was harboring her for the purpose of causing her to engage in commercial sex acts.

201. Upon information and belief, Satnam placed Plaintiff, the victim of the April 2016 attack, on a do-not-rent list, but did not train its staff to recognize the April 24, 2016 attack as a sign of trafficking, and then disregarded its own do-not-rent list by renting a room to J.L. and Plaintiff again in the late summer or fall of 2016, in which J.L. harbored Plaintiff before transporting her to Ohio.

202. Upon information and belief, sex trafficking occurred at the Days Inn before Plaintiff was trafficked there.

203. Satnam knew of, or with reasonable diligence would have discovered, the matters described in this subsection. Had it used reasonable care, it would have investigated them and discovered that the ventures at the Days Inn were violating the TVPRA as to Plaintiff.

## VIII. ROYAL AMERICAN IS LIABLE AS RESORT HOSPITALITY'S GENERAL PARTNER

204. At all times relevant to this action, Royal American was the sole general partner of Resort Hospitality, a Florida limited partnership.

205. Royal American managed and controlled Resort Hospitality's business, including the operation of the Boardwalk, and accepted the benefits of that operation, including its share of the revenue from the rooms rented to Plaintiff's traffickers in which Plaintiff was trafficked.

206. Royal American is therefore liable for Resort Hospitality's obligations to Plaintiff arising from the conduct alleged in this Amended Complaint.

## IX. PLAINTIFF'S INJURIES

207. As a direct and proximate result of Defendants' conduct, Plaintiff was sex trafficked, sexually exploited, and victimized repeatedly at each of the subject hotels.

208. Plaintiff has suffered and continues to suffer substantial physical, mental, emotional, psychiatric, and psychological injuries and economic damages as a result of being trafficked and sexually exploited at the subject hotels. Plaintiff has been diagnosed with post-traumatic stress disorder, recurrent major depressive disorder, and generalized anxiety disorder. She experiences intrusive memories, flashbacks, panic attacks, hypervigilance, dissociation, and sleep disturbance, and she has previously attempted suicide.

209. Plaintiff requires long-term, trauma-focused therapy and psychiatric care.

210. Defendants, during the relevant period, could deny accommodation to or eject a guest for many reasons, including that the guest was visibly under the influence of drugs or alcohol, was believed to be using a room for unlawful purposes, brought in unregistered guests, or disturbed other guests. Defendants did not do so.

## X. FACTS RELATING TO THE TIMELINESS OF PLAINTIFF'S CLAIMS

211. Plaintiff filed this action on June 30, 2026. ECF No. 1.

212. Plaintiff was trafficked into the fall of 2016.

213. Plaintiff's trafficking at the subject hotels was not a series of unrelated, discrete events. It was a continuous course of trafficking, carried out through the same means of force and coercion and the same pattern of nightly room rentals and renewals, as described in ¶¶ 56–115. Plaintiff passed directly from G.G. and K.W. to J.L. without any break in her captivity, and that trafficking did not end until Plaintiff and J.L. were arrested on or around November of 2016.

214. Throughout that period, Plaintiff could not pursue her rights. Her traffickers controlled her movements, her money, and her identity documents; beat her; and threatened her with serious harm or death. See ¶¶ 34–40. When she asked a Cook's Motel housekeeper for help, Plaintiff was beaten for asking. See ¶¶ 79–80.

215. From on or around November 2016 until November 24, 2021, Plaintiff was incarcerated.

216. Since then, Plaintiff has suffered from post-traumatic stress disorder, depression, anxiety, and dissociation caused by her trafficking, which have impaired her ability to confront and recount what was done to her. Her traffickers remain free. J.L. was released in November of 2024 and was later listed by Ohio authorities as a violator at large who should be considered dangerous and possibly armed, and in November 2026 K.W. found Plaintiff and threatened to force her to go back to him.

217. Plaintiff was first trafficked for commercial sex, and first sexually battered, when she was under the age of sixteen, and her trafficking at the subject hotels was a continuation of the cycle of exploitation that began then.

218. Plaintiff has pursued her rights diligently since she was able to do so.

## XI. CAUSES OF ACTION

### COUNT I
### BENEFICIARY LIABILITY UNDER 18 U.S.C. § 1595
### AGAINST DEFENDANT JAI AMBAI, INC. D/B/A SUMMER BREEZE MOTEL

219. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591, and is entitled to bring a civil action under 18 U.S.C. § 1595(a) against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]."

220. Jai Ambai knowingly benefitted, financially and by receiving things of value, from participating in the ventures at the Summer Breeze, as alleged in ¶¶ 139 and 145–147.

221. Jai Ambai participated in a venture to operate the Summer Breeze, taking part in a common undertaking involving risk and potential profit, as alleged in ¶¶ 116–117 and 119.

222. Jai Ambai also participated in a venture with Plaintiff's traffickers, with whom it had a continuous business relationship and a direct association, as alleged in ¶¶ 41–71 and 118–120.

223. The ventures violated 18 U.S.C. § 1591 as to Plaintiff, as alleged in ¶¶ 32–71, 148–152, and 169.

224. Jai Ambai knew or should have known that the ventures violated 18 U.S.C. § 1591, as alleged in ¶¶ 58–71, 148–152, and 169–184.

225. As a direct and proximate result, Plaintiff has suffered substantial physical and psychological injuries and economic damages.

## COUNT II
## BENEFICIARY LIABILITY UNDER 18 U.S.C. § 1595
## AGAINST DEFENDANT SHIVAM AND SAAJAN CORP D/B/A COOK'S MOTEL

226. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591, and is entitled to bring a civil action under 18 U.S.C. § 1595(a) against

"whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]."

227. Shivam and Saajan knowingly benefitted, financially and by receiving things of value, from participating in the ventures at Cook's Motel, as alleged in ¶¶ 140 and 145–147.

228. Shivam and Saajan participated in a venture to operate Cook's Motel, taking part in a common undertaking involving risk and potential profit, as alleged in ¶¶ 116, 121, and 123.

229. Shivam and Saajan also participated in a venture with Plaintiff's traffickers, with whom it had a continuous business relationship and a direct association, as alleged in ¶¶ 41–48, 72–85, and 122–124.

230. The ventures violated 18 U.S.C. § 1591 as to Plaintiff, as alleged in ¶¶ 32–57, 72–85, 148, 153–156, and 169.

231. Shivam and Saajan knew or should have known that the ventures violated 18 U.S.C. § 1591 as to Plaintiff, as alleged in ¶¶ 72–85, 153–156, 169–176, and 185–189.

232. As a direct and proximate result, Plaintiff has suffered substantial physical and psychological injuries and economic damages.

## COUNT III
## BENEFICIARY LIABILITY UNDER 18 U.S.C. § 1595
## AGAINST DEFENDANT RESORT HOSPITALITY ENTERPRISES, LTD. D/B/A BOARDWALK BEACH HOTEL

233. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591, and is entitled to bring a civil action under 18 U.S.C. § 1595(a) against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]."

234. Resort Hospitality knowingly benefitted, financially and by receiving things of value, from participating in the ventures at the Boardwalk, as alleged in ¶¶ 141 and 145–147.

235. Resort Hospitality participated in a venture to operate the Boardwalk, taking part in a common undertaking involving risk and potential profit, as alleged in ¶¶ 116, 125, and 127.

236. Resort Hospitality also participated in a venture with Plaintiff's traffickers, with whom it had a continuous business relationship and a direct association, as alleged in ¶¶ 41–55, 86–93, and 126–128.

237. The ventures violated 18 U.S.C. § 1591 as to Plaintiff, as alleged in ¶¶ 32–57, 86–93, 148, 157–160, and 169.

238. Resort Hospitality knew or should have known that the ventures violated 18 U.S.C. § 1591 as to Plaintiff, as alleged in ¶¶ 86–93, 157–160, 169–176, and 190–193.

239. As a direct and proximate result, Plaintiff has suffered substantial physical and psychological injuries and economic damages.

**COUNT IV**
**BENEFICIARY LIABILITY UNDER 18 U.S.C. § 1595**
**AGAINST DEFENDANT ROYAL AMERICAN DEVELOPMENT, INC.**

240. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591, and is entitled to bring a civil action under 18 U.S.C. § 1595(a) against whoever knowingly benefits from participation in a venture that it knew or should have known violated the TVPRA.

241. Royal American knowingly benefitted from participating in the Boardwalk ventures, as alleged in ¶¶ 144–147.

242. Royal American participated in the Boardwalk hotel operating venture and directed the Boardwalk's continuous business relationship with Plaintiff's traffickers, as alleged in ¶¶ 17, 125–130, and 204–205.

243. The ventures violated 18 U.S.C. § 1591 as to Plaintiff, as alleged in ¶¶ 32–57, 86–93, 148, 157–160, and 169.

244. Royal American knew or should have known that the ventures violated 18 U.S.C. § 1591 as to Plaintiff, as described in ¶ 194 and ¶¶ 86–93, 157–160, 169–176, and 190–193.

245. As a direct and proximate result, Plaintiff has suffered substantial physical and psychological injuries and economic damages.

**COUNT V**
**GENERAL PARTNER LIABILITY FOR RESORT HOSPITALITY'S VIOLATIONS OF 18 U.S.C. § 1595 AND FLORIDA LAW AGAINST DEFENDANT ROYAL AMERICAN DEVELOPMENT, INC.**

246. Resort Hospitality is liable to Plaintiff under 18 U.S.C. § 1595, as alleged in Count III, and for negligence, as alleged in Count X.

247. As Resort Hospitality's sole general partner, Royal American is jointly and severally liable for those obligations, as alleged in ¶¶ 17 and 204–206.

248. As a direct and proximate result of the conduct for which Royal American is liable, Plaintiff has suffered injuries and damages.

**COUNT VI**
**BENEFICIARY LIABILITY UNDER 18 U.S.C. § 1595 AGAINST DEFENDANT KAREN GRANT RESORT PROPERTIES, LLC D/B/A EXECUTIVE INN**

249. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591, and is entitled to bring a civil action under 18 U.S.C. § 1595(a) against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by

receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]."

250. Karen Grant knowingly benefitted, financially and by receiving things of value, from participating in the ventures at the Executive Inn, as alleged in ¶¶ 142 and 145–147.

251. Karen Grant participated in a venture to operate the Executive Inn, taking part in a common undertaking involving risk and potential profit, as alleged in ¶¶ 116, 131, and 133.

252. Karen Grant also participated in a venture with Plaintiff's traffickers, with whom it had a continuous business relationship and a direct association, as alleged in ¶¶ 41–55, 94–101, and 132–134.

253. The ventures violated 18 U.S.C. § 1591 as to Plaintiff, as alleged in ¶¶ 32–57, 94–101, 148, 161–164, and 169.

254. Karen Grant knew or should have known that the ventures violated 18 U.S.C. § 1591 as to Plaintiff, as alleged in ¶¶ 94–101, 161–164, 169–176, and 195–198.

255. As a direct and proximate result, Plaintiff has suffered substantial physical and psychological injuries and economic damages.

## COUNT VII
## BENEFICIARY LIABILITY UNDER 18 U.S.C. § 1595
## AGAINST DEFENDANT SATNAM HOTEL, LLC D/B/A DAYS INN PANAMA CITY/CALLAWAY

256. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591 and is entitled to bring a civil action under 18 U.S.C. § 1595(a) against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]."

257. Satnam knowingly benefitted, financially and by receiving things of value, from participating in the ventures at the Days Inn, as alleged in ¶¶ 143 and 145–147.

258. Satnam participated in a venture to operate the Days Inn, taking part in a common undertaking involving risk and potential profit, as alleged in ¶¶ 116, 135, and 137.

259. Satnam also participated in a venture with Plaintiff's traffickers, with whom it had a continuous business relationship and a direct association, as alleged in ¶¶ 49–55, 102–114, and 136–138.

260. The ventures violated 18 U.S.C. § 1591 as to Plaintiff, as alleged in ¶¶ 32–57, 102–114, 148, and 165–169.

261. Satnam knew or should have known that the ventures violated 18 U.S.C. § 1591 as to Plaintiff, as alleged in ¶¶ 102–114, 165–176, and 199–203.

262. As a direct and proximate result, Plaintiff has suffered substantial physical and psychological injuries and economic damages.

**COUNT VIII**
**NEGLIGENCE, GROSS NEGLIGENCE, AND PREMISES LIABILITY AGAINST DEFENDANT JAI AMBAI, INC. D/B/A SUMMER BREEZE MOTEL**

263. Jai Ambai, as the owner and operator of the Summer Breeze, owed Plaintiff, an invitee who was checked into and staying at the Summer Breeze, a duty to use reasonable care to keep the premises reasonably safe, including from reasonably foreseeable criminal acts of third parties, and a duty to act reasonably in light of the obvious signs that she was being violently abused and sexually exploited on the premises.

264. Jai Ambai breached those duties and was negligent, careless, grossly negligent, and/or reckless, including:

a. by failing to establish adequate sex trafficking prevention policies, procedures, and practices;

b. by failing to make such policies mandatory and to ensure adherence to them;

c. by failing to hire, train, retain, and supervise employees with regard to the prevention of sex trafficking;

d. by failing to adequately monitor and supervise the premises, Plaintiff's traffickers, and Plaintiff;

e. by failing to know and react to the risks of sex trafficking inherent in its business;

f. by failing to recognize the signs that Plaintiff's traffickers and their associates were sex traffickers and that Plaintiff was being sex trafficked;

g. by ignoring Plaintiff's visible injuries, the violence in her room, and the other signs that she needed help;

h. by renting and renewing rooms for Plaintiff's traffickers and accepting their payments;

i. by failing to report Plaintiff's traffickers to the appropriate authorities; and

j. by violating the duties described in the Restatement (Second) of Torts §§ 314A, 315, 317, 323, 324A, 343, and 344.

265. The trafficking of Plaintiff at the Summer Breeze was reasonably foreseeable to Jai Ambai because of the matters described in ¶¶ 58–71 and 170–184, including the signs of trafficking in plain view of its staff (¶¶ 151–152) and the law enforcement activity at the property (¶¶ 178–181).

266. As a direct and proximate result of Jai Ambai's breaches of its duties, Plaintiff was injured and has suffered damages.

## COUNT IX
## NEGLIGENCE, GROSS NEGLIGENCE, AND PREMISES LIABILITY AGAINST DEFENDANT SHIVAM AND SAAJAN CORP D/B/A COOK'S MOTEL

267. Shivam and Saajan, as the owner and operator of Cook's Motel, owed Plaintiff, an invitee who was checked into and staying at Cook's Motel, a duty to use reasonable care to keep the premises reasonably safe, including from reasonably foreseeable criminal acts of third parties, and a duty to act reasonably in light of the obvious signs that she was being violently abused and sexually exploited on the premises.

268. Shivam and Saajan breached those duties and was negligent, careless, grossly negligent, and/or reckless, including:

a. by failing to establish adequate sex trafficking prevention policies, procedures, and practices;

b. by failing to make such policies mandatory and to ensure adherence to them;

c. by failing to hire, train, retain, and supervise employees with regard to the prevention of sex trafficking;

d. by failing to adequately monitor and supervise the premises, Plaintiff's traffickers, and Plaintiff;

e. by failing to know and react to the risks of sex trafficking inherent in its business;

f. by failing to recognize the signs that Plaintiff's traffickers and their associates were sex traffickers and that Plaintiff was being sex trafficked;

g. by ignoring Plaintiff's plea for help to its housekeeper;

h. by renting and renewing rooms for Plaintiff's traffickers and accepting their payments;

i. by failing to report Plaintiff's traffickers to the appropriate authorities; and

j. by violating the duties described in the Restatement (Second) of Torts §§ 314A, 315, 317, 323, 324A, 343, and 344.

269. The trafficking of Plaintiff at Cook's Motel was reasonably foreseeable to Shivam and Saajan because of the matters described in ¶¶ 72–85, 170–176, and 185–189, including the signs of trafficking in plain view of its staff (¶¶ 155–156) and the law enforcement activity at the property (¶ 186).

270. As a direct and proximate result of Shivam and Saajan's breaches of its duties, Plaintiff was injured and has suffered damages.

**COUNT X**
**NEGLIGENCE, GROSS NEGLIGENCE, AND PREMISES LIABILITY AGAINST DEFENDANT RESORT HOSPITALITY ENTERPRISES, LTD. D/B/A BOARDWALK BEACH HOTEL**

271. Resort Hospitality, as the owner and operator of the Boardwalk, owed Plaintiff, an invitee who was checked into and staying at the Boardwalk, a duty to use reasonable care to keep the premises reasonably safe, including from reasonably foreseeable criminal acts of third parties, and a duty to act reasonably in light of the obvious signs that she was being violently abused and sexually exploited on the premises.

272. Resort Hospitality breached those duties and was negligent, careless, grossly negligent, and/or reckless, including:

a. by failing to establish adequate sex trafficking prevention policies, procedures, and practices;

b. by failing to make such policies mandatory and to ensure adherence to them;

c. by failing to hire, train, retain, and supervise employees with regard to the prevention of sex trafficking;

d. by failing to adequately monitor and supervise the premises, Plaintiff's traffickers, and Plaintiff;

e. by failing to know and react to the risks of sex trafficking inherent in its business;

f. by failing to recognize the signs that Plaintiff's traffickers and their associates were sex traffickers and that Plaintiff was being sex trafficked;

g. by ignoring the signs that Plaintiff needed help;

h. by renting and renewing rooms for Plaintiff's traffickers and accepting their payments;

i. by failing to report Plaintiff's traffickers to the appropriate authorities; and

j. by violating the duties described in the Restatement (Second) of Torts §§ 314A, 315, 317, 323, 324A, 343, and 344.

273. The trafficking of Plaintiff at the Boardwalk was reasonably foreseeable to Resort Hospitality because of the matters described in ¶¶ 86–93, 170–176, and 190–193, including the signs of trafficking in plain view of its staff (¶¶ 159–160) and the law enforcement activity at the property (¶ 191).

274. As a direct and proximate result of Resort Hospitality's breaches of its duties, Plaintiff was injured and has suffered damages.

**COUNT XI**
**NEGLIGENCE, GROSS NEGLIGENCE, AND PREMISES LIABILITY AGAINST DEFENDANT ROYAL AMERICAN DEVELOPMENT, INC.**

275. Royal American, as the general partner that managed and controlled the operation of the Boardwalk, owed Plaintiff, an invitee who was checked into and

staying at the Boardwalk, a duty to use reasonable care to keep the premises reasonably safe, including from reasonably foreseeable criminal acts of third parties, and a duty to act reasonably in light of the obvious signs that she was being violently abused and sexually exploited on the premises.

276. Royal American breached those duties and was negligent, careless, grossly negligent, and/or reckless, including:

a. by failing to establish adequate sex trafficking prevention policies, procedures, and practices;

b. by failing to make such policies mandatory and to ensure adherence to them;

c. by failing to hire, train, retain, and supervise employees with regard to the prevention of sex trafficking;

d. by failing to adequately monitor and supervise the premises, Plaintiff's traffickers, and Plaintiff;

e. by failing to know and react to the risks of sex trafficking inherent in its business;

f. by failing to recognize the signs that Plaintiff's traffickers and their associates were sex traffickers and that Plaintiff was being sex trafficked;

g. by ignoring the signs that Plaintiff needed help;

h. by renting and renewing rooms for Plaintiff's traffickers and accepting their payments;

i. by failing to report Plaintiff's traffickers to the appropriate authorities; and

j. by violating the duties described in the Restatement (Second) of Torts §§ 314A, 315, 317, 323, 324A, 343, and 344.

277. The trafficking of Plaintiff at the Boardwalk was reasonably foreseeable to Royal American because of the matters described in ¶¶ 86–93, 129–130, 170–176, and 190–194, including the signs of trafficking in plain view of its staff (¶¶ 159–160) and the law enforcement activity at the property (¶ 191).

278. As a direct and proximate result of Royal American's breaches of its duties, Plaintiff was injured and has suffered damages.

**COUNT XII**
**NEGLIGENCE, GROSS NEGLIGENCE, AND PREMISES LIABILITY AGAINST DEFENDANT KAREN GRANT RESORT PROPERTIES, LLC D/B/A EXECUTIVE INN**

279. Karen Grant, as the owner and operator of the Executive Inn, owed Plaintiff, an invitee who was checked into and staying at the Executive Inn, a duty to use reasonable care to keep the premises reasonably safe, including from reasonably foreseeable criminal acts of third parties, and a duty to act reasonably in

light of the obvious signs that she was being violently abused and sexually exploited on the premises.

280. Karen Grant breached those duties and was negligent, careless, grossly negligent, and/or reckless, including:

a. by failing to establish adequate sex trafficking prevention policies, procedures, and practices;

b. by failing to make such policies mandatory and to ensure adherence to them;

c. by failing to hire, train, retain, and supervise employees with regard to the prevention of sex trafficking;

d. by failing to adequately monitor and supervise the premises, Plaintiff's traffickers, and Plaintiff;

e. by failing to know and react to the risks of sex trafficking inherent in its business;

f. by failing to recognize the signs that Plaintiff's traffickers and their associates were sex traffickers and that Plaintiff was being sex trafficked;

g. by ignoring Plaintiff's visible injuries and the other signs that she needed help;

h. by renting and renewing rooms for Plaintiff's traffickers and accepting their payments;

i. by failing to report Plaintiff's traffickers to the appropriate authorities; and

j. by violating the duties described in the Restatement (Second) of Torts §§ 314A, 315, 317, 323, 324A, 343, and 344.

281. The trafficking of Plaintiff at the Executive Inn was reasonably foreseeable to Karen Grant because of the matters described in ¶¶ 94–101, 170–176, and 195–198, including the signs of trafficking in plain view of its staff (¶¶ 163–164) and the law enforcement activity at the property (¶ 196).

282. As a direct and proximate result of Karen Grant's breaches of its duties, Plaintiff was injured and has suffered damages.

**COUNT XIII**
**NEGLIGENCE, GROSS NEGLIGENCE, AND PREMISES LIABILITY AGAINST DEFENDANT SATNAM HOTEL, LLC D/B/A DAYS INN PANAMA CITY/CALLAWAY**

283. Satnam, as the owner and operator of the Days Inn, owed Plaintiff, an invitee who was checked into and staying at the Days Inn, a duty to use reasonable care to keep the premises reasonably safe, including from reasonably foreseeable criminal acts of third parties, and a duty to act reasonably in light of the obvious signs that she was being violently abused and sexually exploited on the premises.

284. Satnam breached those duties and was negligent, careless, grossly negligent, and/or reckless, including:

a. by failing to establish adequate sex trafficking prevention policies, procedures, and practices;

b. by failing to make such policies mandatory and to ensure adherence to them;

c. by failing to hire, train, retain, and supervise employees with regard to the prevention of sex trafficking;

d. by failing to adequately monitor and supervise the premises, Plaintiff's traffickers, and Plaintiff;

e. by failing to know and react to the risks of sex trafficking inherent in its business;

f. by failing to recognize the signs that Plaintiff's traffickers and their associates were sex traffickers and that Plaintiff was being sex trafficked;

g. by ignoring J.L.'s violence against Plaintiff in its lobby and the other signs that she needed help;

h. by renting and renewing rooms for Plaintiff's traffickers and accepting their payments;

i. by failing to report Plaintiff's traffickers to the appropriate authorities; and

j. by violating the duties described in the Restatement (Second) of Torts §§ 314A, 315, 317, 323, 324A, 343, and 344.

285. The trafficking of Plaintiff at the Days Inn was reasonably foreseeable to Satnam because of the matters described in ¶¶ 102–114, 170–176, and 199–203, including the signs of trafficking in plain view of its staff (¶¶ 167–168) and the law enforcement activity at the property (¶¶ 102–106).

286. As a direct and proximate result of Satnam's breaches of its duties, Plaintiff was injured and has suffered damages.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment in her favor and against each Defendant on each count pleaded against it, and award:

a. all available compensatory damages for the losses described above with respect to each cause of action;

b. past and future medical and mental health expenses, and the costs associated with past and future life care;

c. past and future emotional distress;

d. consequential and special damages;

e. all available noneconomic damages, including pain, suffering, and loss of enjoyment of life;

f. disgorgement of profits obtained through unjust enrichment, and restitution;

g. all damages allowable under the TVPRA;

h. punitive damages with respect to each cause of action;

i. reasonable and recoverable attorney's fees;

j. the costs of this action;

k. pre-judgment and post-judgment interest; and

l. such other and further relief as the Court deems just and proper.

Dated: November 25, 2026

Respectfully submitted,

*/s/ Nathaniel Lucas Foote*
Nathaniel Lucas Foote, Esq.
(pro hac vice)
Ashley Ventrillo, Esq.
Florida Bar No. 1065524
**ANDREOZZI + FOOTE**
4503 North Front Street
Harrisburg, PA 17110
(t) (717) 525-9124 | (f) (717) 525-9143
TeamD@vca.law
*Attorneys for Plaintiff K.M.*

## CERTIFICATE OF SERVICE

The below individual with the firm of Andreozzi + Foote, hereby certifies that I served a copy of the foregoing document upon all counsel of record via CM/ECF.

Date: **11/25/2026** *⁄s⁄ Nathaniel Foote*